UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GS, <br><br>     Plaintiff, <br><br> v. <br><br> Westfield Public Schools and <br> Bureau of Special Education Appeals, <br><br>     Defendants. | Civil Action No. 3:22-cv-10267-IT |

MEMORANDUM & ORDER

September 25, 2023

TALWANI, D.J.

    Plaintiff GS, a minor, brought this suit by and through his parents, against Westfield Public Schools ("Westfield") and the Bureau of Special Education Appeals ("BSEA"). Plaintiff claims that Westfield denied him a right to a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482, and M.G.L. ch. 71B, and that the BSEA Hearing Officer made legal and factual errors during the administrative hearing on his appeal. Plaintiff's First Amended Motion for Summary Judgment [Doc. No. 39] asks this court to overturn the Hearing Officer's decision and order Westfield to place Plaintiff in an integrated residential school. For the reasons set forth herein, Plaintiff's Motion is GRANTED IN PART.

I. **Factual Background**

    A. *Evidence Presented at the Hearing*[1]

Plaintiff is a 15-year-old boy with a long history of various mental and emotional disabilities. Administrative Record (AR)-00161 (BSEA Ruling on Motion to Join Department of Mental Health) (reciting undisputed facts). As a young child, Plaintiff was diagnosed with attachment difficulties, PTSD, anxiety disorder, disruptive mood disorder, learning disabilities, difficulties with executive functioning, ADHD, Reactive Attachment Disorder, and cognitive disabilities. Id.

Plaintiff has been in occupational therapy, physical therapy, and speech/language therapy programs since 2008. Id. at 00005 (Parent's Hearing Request). Beginning in second grade, Plaintiff was enrolled in a "substantially separate language-based classroom" at a Westfield public school. Id. at 00161. During that time, Plaintiff experienced extreme behavioral issues, including rage, anxiety, and aggression. Id. In 2016, during the spring of third grade and fall of fourth grade, Plaintiff was hospitalized on multiple occasions as a result of those behavioral problems. Id. That same year, the Department of Mental Health determined Plaintiff was eligible for services. Id.

In January 2017, in the middle of Plaintiff's fourth-grade year, Westfield agreed to transfer Plaintiff from that public school to the New England Adolescent Research Institute (NEARI). Id. at 00005, 00015 (Westfield Hearing Response), 00161. NEARI is a private, therapeutic special education day school. Id. at 00005. Plaintiff's academic performance improved at NEARI. Id. at 00161. However, Plaintiff continued to exhibit extreme behavioral

---

[1] The administrative record before the hearing officer is docketed here at Doc. Nos. 15-17.

issues, and was hospitalized again during his sixth-grade year in March 2019. Id. at 00005; see id. at 00796 (NEARI Quarterly Progress Report Dec. 03, 2018-Mar. 21, 2019).

On April 18, 2019, while still enrolled at NEARI, id. at 00015, Plaintiff began living at the Northampton Center for Children and Families (NCCF), which is part of the Department of Mental Health (DMH)-affiliated Cutchins Programs for Children and Families. Id. at 00161. NCCF is a residential treatment program. Id. While living at NCCF, Plaintiff's outward signs of aggression have abated. Id. However, Plaintiff continues to be "very closed emotionally" and has demonstrated "extremely limited" self-help and independent living skills. Id. at 00162.

In November 2020, neuropsychologist Dr. Jeffrey Pickar, Ph.D., evaluated Plaintiff over the course of three days. BSEA Decision 4 [Doc. No. 1-3]; AR01093-126 (Pickar Report). He also reviewed Plaintiff's school records dating back to preschool, and interviewed GS's parents, private therapist, school psychiatrist, Cutchins clinician, and family advocate. AR1101-03. He noted that Plaintiff's "adaptive functioning in terms of self-care and self-direction…was severely delayed," but that Plaintiff did not have an intellectual disability. Id. at 01123. Dr. Pickar recommended:

> "[G]iven the continued prominence of [Plaintiff]'s attachment difficulties and anxiety and his history of volatility, aggressiveness and suicidality as more vulnerable feelings emerge, as well as his lower cognitive functioning, and his lower academic and adaptive skills, that [Plaintiff] be placed in an integrated school and residential program geared toward lower functioning adolescents with an emphasis on functional living, academic and vocational skills and that would also allow for increasing contact . . . between [Plaintiff] and his family with support/therapy for all of them." Id. at 01124.

In the spring of 2021, Plaintiff's parents and their advocate, as well as representatives from NEARI, Plaintiff's prior placement, the Department of Mental Health, Plaintiff's outpatient clinicians, and a psychoeducational evaluator (collectively, the "Team") met for Plaintiff's three-year reevaluation for special education services. Id. at 00006, 00015.

Discussion during these meetings focused on the need to find a different school placement for Plaintiff based on the findings from the psychoeducational evaluation and concerns raised by Plaintiff's parents. Id. at 01375-79 (Pickar Direct Exam.); 01407-10 (Greene Direct Exam.); 01495-1500 (Ecker Direct Exam.).

At the first Individual Education Plan (IEP) meeting, held on March 31, 2021, the participants discussed Plaintiff's updated evaluation and questions around proper placement.[2] Id. at 00015. The meeting primarily centered on reviewing and discussing the psychological evaluation performed by Dr. Pickar. Id. at 01496. The parties agreed that it would be useful to have the school psychologist, Dr. Longo, "do some more testing" regarding Plaintiff's learning disabilities, and agreed to meet again later to review those results. Id. at 01407-08.

At the follow-up Team meeting on April 28, 2021, the participants continued to discuss the Pickar psychoeducational evaluation, in addition to the psychological report by Dr. Longo, and an occupational therapy report. Id. at 01407. At the meeting, Dr. Pickar recommended an "integrated residential placement" for Plaintiff. Id. at 01518. The parties all agreed that a comprehensive "behavioral approach" could be effective to address Plaintiff's needs. Id. at 01409. The Educational Administrator for NEARI responded that "that is not a service that NEARI provides." Id. at 01409, 01508 (NEARI representative "stated that they don't have the ABA methodology"). The parties then discussed where they could find a school that would meet

---

[2] Of particular concern at the time was Plaintiff's impending transition from the "NEARI JP into the AP." AR01290. Children attend the JP until sixth grade, after which there is a transition to the middle school (AP). AR01290. Plaintiff's parents were worried about this transition, as transitions can be difficult for Plaintiff. Id. However, by the time of the hearing, Plaintiff's mother testified that Plaintiff had made a relatively successful transition. Id. at 01330-31, 1333 (the transition "went as well as could be expected").

4

Plaintiff's "social-emotional" and "adaptive behavioral [needs] in an integrated residential setting." Id. at 1409. All parties also affirmatively agreed that an "integrated residential setting" was the appropriate solution for Plaintiff, id. at 1410, and "no schools were mentioned that were simply day schools" as potential placements for Plaintiff, id. at 01412.

One day later, Deborah Ecker, the then-interim[3] Westfield Special Education Director, sent an N1[4] to Greene, the family's advocate, but the N1 did not memorialize the team's consensus that Plaintiff required an integrated residential program. Id. at 01413, 01209 (email from Greene to Ecker). Instead, Westfield agreed that Plaintiff's current placement no longer met Plaintiff's needs and explained that "the district is exploring other educational settings/placements and will follow-up with the parents regarding options." Id. at 00324 (Westfield N1).

On May 12, 2021, Ecker, Greene, and Plaintiff's mother met again. Id. at 01413-14. Ecker suggested several potential placements for Plaintiff. Id. at 01414. Specifically, Ecker mentioned the May Institute, but concluded that the school was too focused on autism, and Plaintiff is not autistic. Id. Ecker also mentioned Franklin Perkins and suggested that this would likely be the best fit for Plaintiff. Id. at 01414, 01503. No party discussed the possibility that Plaintiff would remain at NEARI. Id. In the end, the parties did not reach a concrete agreement on placement at the May meeting. BSEA Decision 8 [Doc. No. 1-3].

---

[3] Id. at 01493.

[4] The Massachusetts Department of Education requires schools to send written notice when there is a "proposed school district action" ("N1") or when there is a "refusal to act" ("N2"). These specific documents can be found on the website for the Massachusetts Department of Elementary and Secondary Education under IEP Forms and Notices (https://www.doe.mass.edu/sped/iep/forms/english/) (last visited Sept. 22, 2023).

On June 9, 2021, Plaintiff's mother sent an email to Ecker inquiring about a consent form for a referral packet from the residential school discussed in the May meeting, the Franklin Perkins School. Id. at 01214 (Plaintiff-Ecker Email). Ecker responded stating that Westfield rejected the request to refer Plaintiff to the Franklin Perkins School due to concerns around the school's location and the lack of "evidence, report or recommendation that [Student] requires a residential placement in order to receive a FAPE [free and accessible public education]." Id. Ecker stated that instead "[t]he District continues to recommend a private day school placement," id., and that, "[a]s the Team has determined that NEARI no longer meets [Plaintiff's] educational needs, the District proposes sending a referral to the May Institute." Id. The email also reflected Westfield's decision to deny the referral request for Franklin Perkins,[5] because it was over an hour away from Westfield. Id. Greene, who had received a forwarded copy of the email exchange, responded by reminding Ecker that Dr. Pickar had recommended "an integrated school and residential program," and that the May Institute would not serve Plaintiff's emotional or academic needs. Id. at 01215. At no point did any party discuss the possibility of Plaintiff remaining at NEARI. Id.

On July 27, 2021, Plaintiff's parents requested a hearing by the Bureau of Special Education Appeals (BSEA): (1) challenging the determination that a private special education day school such as the May Institute (referred to in the Request as the "May Center School") in West Springfield was adequate, and (2) seeking a determination that placement at a private special education residential school was necessary to allow Plaintiff access to a free and appropriate public education (FAPE) in the least restrictive environment. Id. at 00004-08. In

---

[5] According to Greene, the N1 attached to the email did not discuss Franklin Perkins as a purely day school option for Plaintiff. Id. at 01415.

response, Westfield contended that "[t]he District did not make promises of a residential placement or propose a residential placement," and that there were "three private day schools within an hour's drive" that could meet Plaintiff's needs. Id. at 00016.

The hearing was held over several days in November 2021. At the hearing, counsel for Plaintiff questioned Ecker about her decision-making with respect to Plaintiff's placement. Id. at 01522-23. During the hearing, Ecker testified that around September 13 (two months earlier and after Plaintiff's parents had requested a hearing), Westfield had determined that NEARI was an appropriate placement for GS. Id. at 01521-32.

B.      *Hearing Officer's Decision*

At the hearing, Plaintiff's counsel contended that Ecker's testimony showed she made a "unilateral decision" from considering residential programs to considering private day programs—including NEARI, which had not been considered during the group IEP meetings. Id. at 01523. The Hearing Officer cautioned counsel that Plaintiff had not alleged a "procedural violation[]," and so inquiries about the deliberation process were not appropriate. Id.

On January 28, 2022, the Hearing Officer issued a decision. BSEA Decision [Doc. No. 1-3]. The Hearing Officer recited the facts largely as stated above, including a discussion of Dr. Pickar's psychological evaluation. Id. at 2-14. The Hearing Officer also included discussion on Plaintiff's behavior while at Cutchins, including an acknowledgement that Plaintiff's residential clinician believed that Cutchins "[wa]s not meeting the totality of Student's needs," id. at 11, and testimony from Plaintiff's teachers at NEARI, who reported that Plaintiff was making progress, id. at 12-13.

In the decision, the Hearing Officer framed the issues as whether: (1) a private special education day school, such as NEARI, provided the student with a FAPE in the least restrictive

7

environment and, (2) if placement at a special education residential school was necessary. Id. at 2. The Hearing Officer also expressly declined to address any potential procedural violations that may have occurred during Westfield's deliberation process. Id. at 2 n.1.

In reaching her conclusion, the Hearing Officer rejected the suggestion of an integrated residential school as the appropriate placement for Plaintiff. Id. at 16. She did so because the suggestion was "based almost entirely on the recommendations of Dr. Pickar," and he had "never observed Student in any setting other than his office during testing." Id. As a result, he "could not see firsthand how [Plaintiff] functioned in either [NEARI or Cutchins]." Id.

Ultimately, the Hearing Officer (1) concluded that Plaintiff's placement at NEARI provided Plaintiff with a FAPE in the least restrictive environment; (2) found that Plaintiff's parents did not meet their burden of showing that Plaintiff required placement in a residential school; (3) found no basis for additional services to be provided by the Department of Mental Health ("DMH") or from the residential program at Cutchins; and (4) made no findings regarding the alleged procedural violations on the ground that they had not been raised in the Hearing Request. Id. at 18.

    C.    *Supplemental Evidence*

The court permitted Plaintiff to submit supplemental evidence (docketed at [Doc. No. 36-1]), see Order on Motion for Leave [Doc. No. 40]. First, Plaintiff submitted a letter from Emily Martino, a licensed clinical social worker at Cutchins, clarifying the services Cutchins offers to its residents. Specifically, Martino stated that "Cutchins is not a school, [and] the agency *does not offer* educational and vocational services that this student may need. While this may appear to be a subtle distinction, we believe it is important to clarify this for the record." [Doc. No. 36-1] (emphasis in original). Second, Plaintiff submitted a letter from Jean Jonker, an Education

Specialist with the Massachusetts Department of Elementary and Secondary Education. The letter followed up on the Hearing Officer's concerns with Westfield's "training in IDEA procedures," and requested that Westfield and Cutchins provide additional documentation to the Department. [Doc. No. 36-1] (quoting BSEA Decision).

Further, at the court's request, the parties jointly filed Plaintiff's 2022-2023 IEP. [Doc. No. 48].

## II.     Standard of Review

### A.     *Statutory and Regulatory Framework*

IDEA requires states receiving federal funds to provide all children with disabilities with a free and appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A). A FAPE is implemented through a written statement known as an Individualized Education Program ("IEP") and is tailored to meet the child's unique needs based on the "present levels of academic achievement and functional performance." Id.; see Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 181 (1982). IEPs must include measurable goals, a description of how progress is measured, and a statement of services determined necessary for the child. 20 U.S.C. § 1414(a)(A).

When required, IEPs must also include transition services, which are a coordinated set of activities "focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities"; that "includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocation evaluation." 20 U.S.C. §§ 1401(34)(A), (C). While IDEA requires transition

services to begin at age sixteen, id. at § 1414(d)(1)(A)(i)(VIII), Massachusetts requires implementation beginning at age fourteen, M.G.L. c. 71B, § 2.

Parental involvement in the IEP process is a critical procedural protection that "emphasize[s] collaboration among parents and educators and require[s] careful consideration of the child's individual circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist., RE-1, 580 U.S. 386, 391 (2017); accord Rowley, 458 U.S. at 182 ("Parents or guardians of [disabled] children must be notified of any proposed change" in the IEP). IDEA also requires schools to provide "written prior notice" of proposed changes, or refusal to change, regarding student placement. 20 U.S.C. § 1415(b)(3). Massachusetts has a similar requirement. M.G.L. ch. 71B, § 3. If parents and educators disagree on a child's IEP, the parent may challenge the adequacy of the IEP through a hearing before a state or local educational agency. 20 U.S.C. § 1415(f)(1)(A). If the parent is "aggrieved by the findings and decision made" during the hearing, the parent may seek further review in either state or federal court. Id. at § 1415(i)(2).

While Massachusetts law parallels IDEA, it reflects a more exacting standard requiring an IEP that is "reasonably calculated to assure the child's *maximum* possible development in the least restrictive environment." Frank S. v. Sch. Comm. of Dennis-Yarmouth Reg'l Sch. Dist., 26 F.Supp.2d 219, 226 (D. Mass. 1998) (emphasis in original).

B.     *Standard of Review*

A "motion for summary judgment in an IDEA case is simply a vehicle for deciding the relevant issues, and the non-moving party is not entitled to the usual inferences in its favor." Sebastian M. v. King Philip Reg'l Sch. Dist., 685 F.3d 79, 84-85 (1st Cir. 2012). Judicial review of an administrative decision under IDEA is governed by a preponderance of the evidence standard, and requires the district court to review the administrative record as well as any

additional admitted evidence. 20 U.S.C. § 1415(i)(2)(C); see G.D. v. Westmorland Sch. Dist., 930 F.2d 942, 945 (1st Cir. 1991) (reciting appropriate standard of review). The court, under its "informed discretion," must give the administrative proceeding "due weight." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993) (quoting Rowley, 458 U.S. at 206); accord G.D., 930 F.2d at 946 (1st Cir. 1991). This review "requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review." Lenn, 998 F. 2d at 1086.

To determine if an IEP is "reasonably calculated," the court must determine if the "proposed IEP is adequate and appropriate for a particular child at a given point in time." Town of Burlington v. Dep't of Educ. for Commonwealth of Mass., 736 F.2d 773, 788 (1st Cir. 1984). This determination requires a review of any procedural and substantive components raised by the claim. See Rowley, 458 U.S. at 206-207.

**III.    Discussion**

   A. *Procedural Challenges*

Plaintiff alleges that the Hearing Officer erred in declining to admit evidence related to the alleged procedural error where Plaintiff's parents did not raise the error in their hearing request. In response to the Hearing Officer's decision, Plaintiff's parents argue that they did not learn of Westfield's decision to keep GS at NEARI until the hearing began, and were therefore unable to challenge Westfield's decisionmaking process in the hearing request. Pl.'s Mem. SJ 6-7 [Doc. No. 38]. For the reasons explained below, the court finds that (a) Plaintiff's parents did not waive their procedural challenge by not including it in the hearing request; (b) while inefficient, the Hearing Officer's decision to prohibit Plaintiff's parents from litigating the procedural challenge on the appeal before her was not an error; (c) the Hearing Officer *did* err in

blocking evidence relevant to the substantive issue insofar as it was merely related to the procedural issue; and (d) that failure to allow cross-examination may have substantively affected the outcome of the hearing.

1. Plaintiff's Parents Did Not Waive Their Procedural Challenge

Plaintiff argues that where the procedural violation was not known to Plaintiff's parents in advance of the hearing, it was unrealistic to expect them to include this procedural issue in the hearing request. Pl.'s Mem. SJ 6 [Doc. No. 38]. Westfield does not dispute that the decision to keep Plaintiff at NEARI was made after Plaintiff's parents filed the hearing request. Indeed, Ecker testified that she made the final decision to change the recommendation to NEARI "after having discussions with NEARI…during the prehearing process." AR01531. Accordingly, the issue could not have been included in the hearing request and was not waived.

2. The Hearing Officer Did Not Err in Precluding Consideration of the Procedural Violation During the Hearing Before Her

Under Rule 1:B of the BSEA Hearing Rules for Special Education Appeals, "[t]he Party requesting a hearing shall not be allowed to raise issues at the hearing that were not raised in the hearing request unless the other party agrees or the hearing request is amended in accordance with state and federal law." 20 U.S.C. § 1415(f)(3)(B). Westfield did not agree to include the issue of delayed notice regarding the NEARI placement decision, and Plaintiff's parents did not amend the hearing request. Accordingly, under the Hearing Rules, the Hearing Officer acted within her authority in precluding consideration of whether Westfield committed a procedural violation by failing to discuss the placement with the parents at the hearing before her.[6]

---

[6] This finding does not mean that Plaintiff's parents are barred from raising the procedural error in a separate proceeding. The court notes the inefficiency in the Hearing Officer not simply encouraging an amendment of the hearing request and considering the issue.

3.  The Hearing Officer Did Err in Limiting Evidence Relevant to the Substantive Issue of Plaintiff's Appropriate Placement Merely Because It Could Also Relate to the Procedural Violation

On June 9, 2021, following the final Team meeting, Ecker, Interim Special Education Director at Westfield, sent an N1 to Plaintiff's parents regarding the March-April IEP meeting. AR00322. In the N1, Westfield discussed sending a referral to the May Institute. Moreover, Westfield specifically explained that "the district is proposing this referral *because the Team has determined that NEARI no longer meets [the student's] educational needs*." Id. (emphasis added).

When Plaintiff attempted to ask about the change of decision, questions to the witnesses were limited by the Hearing Officer. For example, Ecker testified that she spoke with NEARI staff about Plaintiff remaining at NEARI following the final IEP meeting: When counsel for Plaintiff asked Ecker if she had followed up with Plaintiff's parents after that conversation or whether that placement was appropriate, Ecker was not permitted to answer. Id. at 01525, 01532-33. Plaintiff argues that by not allowing this cross-examination of the witness, they were denied the crucial opportunity to make the connection between the procedural violation and the substantive issue at the heart of the hearing, which was Westfield's denial of a free appropriate public education for Plaintiff. Id. at 01522-24.

The court agrees. By limiting cross-examination of Westfield's late-breaking decision to keep Plaintiff at NEARI because it might also touch on a procedural violation, the Hearing Officer did not have a fully developed record for Plaintiff's substantive challenge to the placement recommendation.

B.     *Substantive Challenges*

    1.  The Hearing Officer Erroneously Discounted Dr. Pickar's Testimony Regarding Plaintiff's Needs

The Hearing Officer determined that NEARI provides Plaintiff with a free appropriate public education in the least restrictive environment. BSEA Decision 16 [Doc. No. 1-3]. She found the testimony from Westfield, NEARI, and Cutchins to be compelling as "there is no credible evidence that Student is not making progress at both NEARI and Cutchins." Id. at 17.

Plaintiff argues that the Hearing Officer erred in concluding that NEARI provides a free appropriate public education in the least restrictive environment. GS Mem. SJ 16 [Doc. No. 38]. Plaintiff further argues that the Hearing Officer did not properly credit testimony from Plaintiff's witnesses, specifically Dr. Pickar, and instead, fully credited testimony from Westfield's witnesses and ignored contradictory evidence. Id. at 14.

In response, Westfield asserts that Plaintiff has made notable progress relating to social, behavioral, and emotional growth based on progress reports shared by NEARI and witness testimony. This includes a "successful transition from the latency program," improvement in grammar, writing, and reading skills, and lack of behavioral concerns during the past year. AR00309, 00516-34, 01460. Westfield contends that it was appropriate for the Hearing Officer to give Dr. Pickar's testimony limited weight based on the amount of time that passed between Dr. Pickar's interaction with Plaintiff and the hearing, given that Plaintiff could have advanced in that elapsed time.

The court must give deference to the Hearing Officer's weight of the relevant evident and may disregard them only if it "determines that they are unreliable or incorrect in light of the totality of the record." Ross v. Framingham Sch. Comm., 44 F. Supp. 2d 104, 112 (D. Mass. 1999). "[T]he District Court's role in addressing a challenge under the IDEA to an administrative

ruling is an exercise of 'involved oversight' of the factual findings and conclusions of the agency." Doe v. Newton Pub. Sch., 48 F.4th 42, 54 (1st Cir. 2022) (quoting S. Kingstown Sch. Comm. v. Joanna S., 773 F. 3d 334, 349 (1st Cir. 2014)).

In this case, the court finds that the Hearing Officer's disregard for Dr. Pickar's testimony was "unreliable [and] incorrect in light of the totality of the record." See Ross, 44 F. Supp. at 112. The Hearing Officer primarily limited the weight of Dr. Pickar's testimony "because he never observed Student in any setting other than his office during testing." BSEA Decision 16 [Doc. No. 1-3]. However, the Hearing Officer failed to note that in addition to the in-office consultations, Dr. Pickar conducted seven unique interviews, often over multiple sessions, with other individuals intimately familiar with Plaintiff's out-of-office behavior. The interviewees included Plaintiff's parents, the school therapist and psychiatrist, Plaintiff's therapist, and residential clinicians. Though Dr. Pickar was unable to observe Plaintiff outside of the office, he considered evidence from across the span of Plaintiff's life—including information provided by other clinicians and therapists who had worked with Plaintiff for years. The record before the Hearing Officer showed that Dr. Pickar thoroughly considered Plaintiff and his unique challenges. Consequently, the Hearing Officer erred in giving his testimony limited weight.

2. The Hearing Officer Erroneously Concluded that NEARI Could Satisfy IDEA's Statutory Requirements

Plaintiff argues that the Hearing Officer erred in concluding that NEARI could appropriately provide statutorily required Transition Services. Plaintiff contends that in Plaintiff's current placement, "[Plaintiff] has made very, very little progress on th[e] journey to adulthood and independence." Pl.'s Mem. SJ 17 [Doc. No. 38] (quoting Mother Direct Exam., AR01309). Further, Plaintiff reiterates that NEARI does not provide adequate support for adaptive living skills, which are necessary for Plaintiff's transition to "becoming . . . a functional

15

adult." Id. (quoting Pickar Direct Exam., AR01382). Finally, Plaintiff argues that the Hearing Officer's decision to the contrary erroneously hinged on the continuous support of Cutchins to provide the bulk of the Transition Services, when Cutchins is not obligated to provide any services under the IEP. Id. at 20-21.

Westfield makes three arguments in response. First, Westfield contends that issues around Transition Services were not included in the hearing complaint and thus, cannot be raised on appeal. Def.'s Opp'n SJ 16-17 [Doc. No. 41]. Second, Westfield contends that Plaintiff *does* have a Transition Plan (incorporated in Plaintiff's IEP under both "social/emotional goal" and "transitional goal"), and that Plan is supported by both NEARI and Cutchins. Id. at 17-18, 20. Finally, Westfield argues that there is no current plan to move Plaintiff from Cutchins, so it is irrelevant that the IEP cannot obligate Cutchins to provide services to Plaintiff. Id. at 14.

      a. Plaintiff's Parents Did Not Waive Their Argument Regarding Transition Services

First, Plaintiff is correct that because Transition Services are a mandated part of the statutory right to a free appropriate public education, there was no need to raise a separate issue around those services in the hearing. By raising a claim that a student is not receiving a free appropriate public education, issues related to Transition Services are necessarily included in that claim.

      b. The Hearing Officer Improperly Ignored Evidence Regarding the Need for Adaptive Living Skills

Second, the Hearing Officer did not appropriately consider the totality of the evidence supporting Plaintiff's need for adaptive living skills. The Hearing Officer concluded, based on testimony of NEARI representatives and progress reports from the school, that Plaintiff was "making both social and emotional progress," and did not require additional services. BSEA Decision 16 [Doc. No. 1-3].

Specifically, the Hearing Officer referenced Plaintiff's ability to shower on his own, his relatively good hygiene, and the fact that adaptive skills are goals outlined in Plaintiff's treatment plan. BSEA Decision 14, 17 [Doc. No. 1-3] (discussing a report stating that "[w]ith prompts from staff Student regularly completes all ADL[7] tasks"). But the fact that Plaintiff is able to complete some tasks independently (with "prompt[ing]" from trained staff) does not equate to "evidence of learning independent living skills." Pl.'s Mem. SJ 20 [Doc. No. 38]. The goal is to help Plaintiff to be able to live an independent life. While it is not unusual to have to provide reminders to children, it is unusual to have to remind a fourteen-year-old to brush their teeth or how to properly take a shower.

The Hearing Officer's conclusion is also contradicted by the testimony of several experts. Dr. Pickar noted the importance of specific transition services, such as incorporating activities of daily living into various aspects of Plaintiff's daily routine. AR01124. Dr. Pickar also testified that he had "concerns on both the cognitive and academic side, as I saw a real plateauing for his intellectual capacities and of his academic skills and then even lower kind of independent living skills or ADLs." Id. at 01361.

Thomas Longo, the Westfield school psychologist, testified that Plaintiff would do well with supports that provided him "an effort to improve his overall adaptive functioning, especially with hygiene, ADLs, things like that." Id. at 01557. And Emily Martino, residential clinician at Cutchins, described how Plaintiff's lower independent living skills could affect his ability to successfully transition. Id. at 01599. In sum, the Hearing Officer's conclusion that Plaintiff does

---

[7] ADL stands for "Activities of Daily Living," which include actions such as brushing one's teeth, taking a shower, and eating.

17

not require additional services addressing adaptive living skills was based on a misconception of Plaintiff's abilities and a failure to consider all relevant evidence.

        c.   The Hearing Officer Improperly Considered Services Provided by Cutchins as Part of the IEP

Third, the Hearing Officer improperly considered the services provided by Cutchins as part of the IEP requirements. Services provided by Cutchins are offered *in addition* to those mandated by Plaintiff's IEP. See Pl.'s Rep. Mot. for Leave to File Resp. to Def.'s Opp'n to Mot. for Leave to File Add'l Evidence, Ex. 1 (Martino Letter) [Doc. No. 36-1] ("[B]ecause Cutchins is not a school, the agency *does not offer* educational and vocational services that this student may need."). An IEP is a program that must be carried out by the school. If a student requires certain supports, the school is responsible for providing those supports within the bounds of the student's special education needs. If services are deemed necessary within an IEP, they must be provided and managed by the school, not delegated to an independent third party. The support provided by Cutchins is being used by Westfield as a fill-in for services that are the responsibility of the school. If NEARI is unable to provide the required Transition Services, then Westfield—not Cutchins—must provide alternative accommodations or supplemental supports.

While the Hearing Officer noted that she found "no basis" for the DMH to provide additional services, BSEA Decision 18 [Doc. No. 1-3], Cutchins is not under the Massachusetts Department of Secondary and Elementary Education and thus, the Hearing Officer was outside her scope of authority in making such a finding. See Martino Letter [Doc. No. 36-1]. She did not have the authority to require Cutchins to provide any additional services for Plaintiff. See id. Additionally, fulfilling the requirements of an IEP is outside of the purview of Cutchins. Id. Any special education needs must be provided by the school.

At bottom, because of an incomplete record and a fundamental misunderstanding of the services offered by the various institutions at play, the Hearing Officer's decision failed to adequately address the issue all parties had previously found to be critical: whether a residential program was necessary to meet Plaintiff's social, emotional, and academic needs to the degree required by law.

## IV. Conclusion

For the foregoing reasons, the court finds that the Hearing Officer erred in concluding that Westfield's placement of Plaintiff at NEARI provided Plaintiff with a Free Appropriate Public Education in the least restrictive environment. The court therefore remands the matter for Westfield to reconsider whether a residential program is required to meet Plaintiff's needs, with Plaintiff's parents' input as required by the statutory scheme, and taking into account Dr. Pickar's report (or any updated report), NEARI's lack of adaptive skills programming, and Cutchins' lack of obligations under the IEP.

Plaintiff's First Amended Motion for Summary Judgment [Doc. No. 39] is GRANTED IN PART.

IT IS SO ORDERED

September 25, 2023                    /s/    Indira Talwani
                                      United States District Judge